### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**RYAN COOPER** | **Case No. 1:19-cr-00382**<br><br>**Judge Ketanji Brown Jackson** |

### MR. RYAN COOPER'S MEMORANDUM IN AID OF SENTENCING

Mr. Ryan Cooper respectfully submits his Memorandum in Aid of Sentencing. Mr. Cooper will appear before the Court for his plea hearing and sentencing on March 11, 2021. He has agreed to plead guilty to one count of Distribution of Child Pornography, in violation of 18 U.S.C. § 2252(a)(2). The statutory mandatory minimum sentence for that offense is 60 months. The agreed-upon guidelines range is 151 to 188 months. The Presentence Report ("PSR") recommendation, however, is 60 months' incarceration and 15 years of supervised release. ECF No. 18. In light of Mr. Cooper's unwavering acceptance of responsibility, history of being a victim of sexual assault, his serious mental health issues and the plethora of impressive steps Mr. Cooper has taken since the time of his offense to grapple with those issues, his spotless criminal history, his stellar work record, and the very low risk that he will ever re-offend as confirmed by a clinical psychologist, Mr. Cooper respectfully suggests that the "sufficient, but not greater than necessary" sentence in this case is the mandatory minimum sentence of 60 months, followed by five years of supervised release. Mr. Cooper respectfully requests that, in light of the continued COVID-19 outbreak in jails and prisons, and the imminence of the vaccine being made widely available, that

he be permitted to self-surrender to the Bureau of Prisons when he is set to commence his term of incarceration. The government has no objection to that request.

## INTRODUCTION

Ryan Cooper, in the midst of a deep depressive state, isolated from his family and friends and on a poorly matched medication for his bipolar II disorder, made a terrible mistake. That mistake has upended his young life, destroyed a very promising career and will separate him from his family and friends for a period of years. The charge to which he will plead carries a mandatory minimum of five years—there is thus no question that he must serve prison time for what he has done. The question is how soon he can be returned to his large and strong network of family and friends and to his therapy and medication regimen, and start the hard work of rebuilding his young life.

There are a number of indicators that should give this Court full confidence that the mandatory minimum of five years imprisonment and a term of five years supervised release is the appropriate sentence.

First, Mr. Cooper is at a low risk to re-offend, as Dr. Tashna Felix, a trained Clinical and Psychologist and Certified Sex Offender Treatment Provider, Michael Giordano, a licensed social worker, and Jean-André Constant, a licensed Certified Sex Offender Treatment Provider *all* opine. Dr. Felix conducted the psychosexual evaluation in this case and found that Mr. Cooper is at a "Low" risk to re-offend and "his prognosis is good." Ex. 2 at 21. Mr. Giordano, Mr. Cooper's therapist with whom he has discussed his offense, concluded that Mr. Cooper "does not fit the diagnostic criteria for Pedophiliac Disorder" and opines, "I do not believe Ryan is at risk of further involvement with such imagery and pornography, nor have I believed that he was at risk of re-offending in more extreme ways. Ex. 3C at 2. Mr. Constant, the sex offense

treatment provider Mr. Cooper has been seeing since the execution of the search warrant, writes, "his rehabilitation prognosis is considered significantly positive." Ex. 3B.

Second, Mr. Cooper is immensely remorseful and has done everything that a person in his position possibly could to redeem himself. He ceased all illegal conduct after the execution of the search warrant in February 2019. Since then, he has remained in the community, offense-free, for *over two years*. He has been on high-intensity supervision ("HISP") since his initial appearance on February 4, 2020. His performance on HISP has been nothing short of flawless. He cooperated with the government. He gave the FBI passwords to all of his devices and met with the government to provide information about where he accessed the illegal material. And he sought therapy to address the offense conduct. He immediately told his therapist about the offense after the execution of the warrant and then, two months later, started additionally seeing a sex offender treatment provider. To date, he has participated in over 147 combined therapy sessions addressing the underlying causes of his offense conduct.

Third, there are significant mitigating circumstances surrounding Mr. Cooper's offense. Mr. Cooper suffers from bipolar II disorder, generalized anxiety disorder, and panic disorder. At the time the offense conduct began, he had just moved to Seattle, across the country from all of his family and friends. Mr. Cooper's mental health issues are exacerbated by isolation, as he experienced in Seattle. He fell into a deep depression, sought a new psychiatrist, and was prescribed a poorly matched medication. The offense conduct occurred in this context. Additionally, Mr. Cooper is the victim of two sexual assaults—the first of which took place when he was only 15 years old, and the second in college. Since the execution of the search warrant, he has done the hard work in therapy of reconciling his past trauma with the offense

conduct in this case and ensuring that his mental health issues will no longer have such a malign impact.

Fourth, though Mr. Cooper is pleading guilty to distribution of child pornography, he only engaged in distribution by "reblogging" (which is similar to "retweeting") over the internet, not distribution in the traditional sense of transmitting material directly to another person. The pornography was material already available on the open Internet; Mr. Cooper played no role in its creation.  There is also no evidence whatsoever that Mr. Cooper ever did or would attempt any contact offense. *See* Ex. 3B (Jean-André Constant Letter) ("Mr. Cooper has consistently denied any contact offense(s) and there are no indications that would suggest otherwise.").

Fifth, Mr. Cooper's time in prison will be difficult. He is a slight, homosexual young man, who will stand convicted of a sex offense, has serious mental health issues that are exacerbated by isolation from family and friends, and is a prior victim of sexual assault. These will all make prison far harder for Mr. Cooper than for many other individuals in his position.

Finally, Mr. Cooper is a young man—only 29—and has led an otherwise law-abiding life, marked by academic and career achievements and constant kindness and respect to those in around him. There is every indication that this offense was an aberration and that he will return to a law-abiding life when his sentence is complete. A five-year sentence is more than sufficient.

## I.        PROCEDURAL HISTORY

On February 19, 2019, federal agents executed a search warrant at Mr. Cooper's residence. Mr. Cooper did not resist during the execution of the warrant. Though he initially said, before consulting with counsel, that he did not remember when he last used Tumblr (where he had reblogged images of child pornography), he also readily provided his phone number and other information tied to the Tumblr accounts the FBI was investigating.

Mr. Cooper swiftly hired counsel and began working, through his attorney, to be as cooperative as he possibly could. He gave the FBI, through counsel, passwords to his devices. On July 19, 2019, he voluntarily met, along with his lawyers, with an FBI agent and Andrea Hertzfeld, the AUSA assigned to the case at the time. He provided information about where he had accessed the child pornography. He freely answered all of the questions posed to him, no matter how uncomfortable. He took complete responsibility for his offense. He apologized to Ms. Hertzfeld and the agents and through them, to the victims who appeared in the images. Though, as is often true in cases like this, law enforcement was ultimately unable to use the information Mr. Cooper provided, Mr. Cooper did everything in his power to try to assist the government.

Mr. Cooper also immediately sought therapy to address the offense conduct. First, he told Michael Giordano, a licensed social worker, psychotherapist, and Certified Sex Therapist, who Mr. Cooper had been seeing to address his own mental health issues and past sexual trauma, about the conduct. Mr. Giordano writes that Mr. Cooper, "immediately told me about the incident" after the execution of the search warrant. Ex. 3C at 1. They then spent "multiple sessions" addressing why Mr. Cooper viewed the pornography. *Id*.

Mr. Cooper then, just two months after the warrant was executed, additionally started seeing Jean-André Constant, a sex offender treatment provider and licensed social worker, for therapy explicitly directed at the offense conduct.

Mr. Cooper has continued to be cooperative and diligent up through the present. He consented to being charged by Information, which was filed on November 15, 2019. In advance of his initial appearance, Mr. Cooper voluntarily (and at his own expense) underwent a psychosexual examination, in preparation for sentencing.

On February 4, 2020, Mr. Cooper made his initial appearance. He was released to the High Intensity Supervision Program ("HISP") with a curfew from 10:00 p.m. to 6:00 a.m. ECF No. 11. His conditions included not accessing electronics and maintaining compliance with his mental health treatment. Mr. Cooper's performance on HISP—which has lasted *over a year* now—has been flawless.

Mr. Cooper's sentencing was initially set for April 9, 2020. However, between his initial appearance and his scheduled sentencing, the COVID-19 pandemic hit the United States. Mr. Cooper's sentencing was continued multiple additional times at his request and with the consent of the government.

Immediately before Mr. Cooper's initial appearance, he resigned from Tableau, the company where he excelled for nearly three years. Mr. Cooper resigned because he expected that the Court might set internet conditions preventing him from working and in anticipation of sentencing. After his initial appearance, Mr. Cooper started volunteering with D.C. Central Kitchen. Ex. 4OO (Letter from Jess Towers at D.C. Central Kitchen). However, once the pandemic worsened, D.C. Central Kitchen suspended all volunteer operations. *Id.*

On May 11, 2020, Mr. Cooper filed a Consent Motion to Modify Conditions of Release, requesting that he be permitted to use the internet under supervision exclusively to search for a new job. ECF No. 16. Given the uncertainty of the length of the pandemic, Mr. Cooper hoped to be able to resume work and work until sentencing. This Court granted Mr. Cooper's motion on May 13, 2020. The job search was difficult. Mr. Cooper applied for 153 jobs before being hired at Graphicacy. On September 17, 2020, Mr. Cooper filed another Consent Motion to Modify Conditions of Release, this time requesting that he be able to use the internet for work, under supervision. ECF No. 20. This Court granted that motion on September 22, 2020. ECF No. 21.

Several months later, Mr. Cooper was recruited by a former colleague to join a business intelligence consulting firm. Mr. Cooper filed another Consent Motion to Modify Conditions of Release, requesting that he be permitted to work at that company under the same conditions. ECF No. 30. This Court granted that motion on December 7, 2020.

The Court ordered Mr. Cooper to submit a biweekly declaration from Michael Cooper (no relation) indicating that Ryan Cooper was compliant with the condition of using the internet only for work and that Mr. Cooper's laptop remained at Michael Cooper's home. Mr. Cooper has faithfully abided by those conditions and filed biweekly declarations stating the same. *See* ECF Nos. 22, 23, 27, 28, 29, 33, 36, 37, 39, 40, 41. Mr. Cooper's father writes, "Ryan has been very remorseful over the last year and has not tried to lighten the severity of his actions in any way. He hasn't missed one curfew and has actually reached out to his PSO when he thought his ankle monitor was not operating correctly to make sure the court understood how seriously he has taken this process." Ex. 4H at 5. Mr. Cooper's staunch adherence to pretrial conditions and dedication to work are especially impressive, given the toll that the isolation of the pandemic has taken on him and the ways in which it has exacerbated his bipolar II disorder.

## II.    MR. COOPER'S PERSONAL AND PROFESSIONAL HISTORY

### A. Childhood and High School and College Years

Mr. Cooper was born in Concord, New Hampshire. He is the only child of Suzanne and David Cooper. He lived in Texas and California from ages two to five, and the family settled permanently in Massachusetts when Mr. Cooper was age five.

Though Mr. Cooper was an only child, he grew up with an extremely tight-knit extended family. His cousins Elise Spencer, Erica Sullivan, and Jeff McKown all write about their family's closeness. Both Elise and Jeff are also only children and explain that they saw Ryan as a

brother. Ex. 4LL at 1, Ex. 4Z. Erica writes that she was the oldest of three siblings, "making Ryan the closest thing I had to an older brother and making him a person who I looked up to growing up." Ex. LL at 1. Ryan "has an innate ability to see a situation in an unbiased manner and calmly walk through it with me," which "has come in handy during a multitude of sibling disagreements where Ryan has been around to mediate and deescalate the situation." *Id*. Erica explains why she looks up to Ryan, "[h]is calm demeanor and thoughtfulness is something that I admire about him and try to emulate in myself." *Id*. Jeff, who is 13 years older than Ryan, echoes Erica's description, writing that he'd watch Ryan "caringly interact with our younger cousins, who looked up to Ryan, listening actively to them and offering guidance." Ex. 4Z at 1-2.

Many of Mr. Cooper's family members and family friends write about his dedication to his family and his maturity, even at a young age. Patrice Sullivan, his aunt and godmother, writes about a time that Mr. Cooper "thoughtfully shopped for a special gift for his mother—a glass-blown horse" when he was 10 years old. The horse was stolen out of Ms. Sullivan's daughter's stroller later that afternoon. Mr. Cooper "was heartbroken, but even at a young age, he maturely handled the situation, returning to the store, speaking politely with security, ultimately receiving a replacement gift." Ex. 4NN. Richard Binder, a close family friend, writes, "I have seen Ryan grow from a young respectful boy who has matured into a highly driven and intellectual young man." Ex. 4D. His family friend Kimberly Kingston writes, "[w]hen I met him he was 5 years old, I found a very smart child, clearly academically advanced" and that as she watched him through the years, "it was clear he presented more maturely than his peers." Ex. 4V at 1. His father, David Cooper, recalls being "very nervous" when Ryan attended the Tae Kwon Do Junior Olympics at age 12, but Ryan was "cool and collected." Ex. 4H at 1. His uncle, Andrew McKown, writes that "[e]very year at family gatherings, Ryan created and presented songs and

skits." Ex. 4Y at 1. Patrice Sullivan describes a similar devotion to family gatherings, writing that every year Mr. Cooper would put on a fireworks "extravaganza" with his father, "even printing programs" for the event. Ex. 4NN. He would help his parents plan and prepare a special Christmas dinner every year; "[h]e'd print a menu and announce each course with delight." *Id*.

Despite his strong support network, elementary school was difficult for Mr. Cooper. He "was often bullied and even physically assaulted[.]" Ex. 2 (Dr. Felix report) at 4. It was "challenging" for him to fit in with the other students. *Id*. He transferred to a different middle school to escape the bullying. *Id*. Things were not easy there, either. In the seventh grade, multiple students inappropriately touched him and other female students on the buttocks. PSR ¶ 73.

Mr. Cooper then attended Brewster Academy, a co-ed boarding school in New Hampshire, for high school (from 2005 to 2009). PSR ¶ 116. His mother writes, "He was bullied in his adolescent years both in the neighborhood as well as middle school and so he took and did well on entrance exams to attend a small boarding school in NH with hopes of a better environment[.]" Ex. 4O at 1. He took AP classes and was the captain of his choir, a lead in the school plays, debate team captain, a varsity coxswain and rower, president of the Gay-Straight Alliance, and the editor-in-chief of the school's literary magazine. *See* PSR ¶ 116. His grandmother fondly remembers him performing in Alice in Wonderland, Big River: The Adventures of Huckleberry Finn, West Side Story, and Urinetown: The Musical. Ex. 4N at 1. He graduated on May 23, 2009, with above average grades, and no disciplinary or behavioral issues. PSR ¶ 117. Kimberly Cooper, Mr. Cooper's aunt, writes about a memory from his high school graduation that still sticks with her, over a decade later. She "remember[s] Ryan speaking to all of us that day, thanking us for supporting him during his formative years, and he told us it really

did take 'a village to raise him' and that village was his family." Ex. 4J at 1. She writes, "[i]t was impressive to me that instead of taking all of the credit for his achievement of graduating from Brewster Academy, he credited his family for helping him reach this goal." *Id*.

Mr. Cooper attended The George Washington University ("GW") for college, from 2009 to 2013. PSR ¶ 118. He struggled academically his freshman year, but ultimately graduated *cum laude* with a 3.53 GPA, with a B.A. in International Affairs and a minor in LGBT Sexuality Studies. *Id*.  He also started working as a host at Sequoia, a restaurant in Georgetown, while at GW, and, as is described in more detail below, continued working there after graduation.

Mr. Cooper's college years were marked by extremely hard work and acts of kindness. His friend and college classmate Andrew Dean describes Ryan agreeing to help him by being a model for a photography portrait their junior year. Ex. 4Q at 1. He explains that he had difficulty finding a male model but "Ryan trusted me, overcame his discomfort, and let me photograph him." *Id*. He also explains that Mr. Cooper "would hunker down so intensely during midterms and finals that I knew there would be a few weeks each semester where he would be slow to answer messages and would not be available to meet." *Id*. His friend Michael Cooper similarly describes witnessing "his work ethic firsthand" and seeing "how diligently he would work to get one term paper after another finished." Ex. 4M at 1. Michael Cooper's mother, Margo Cooper, remembers that "[h]e would go to school during the day and managed to be at his restaurant job in the evening on time." Ex. 4K.

Laurie Murray, a close family friend, describes visiting Mr. Cooper at GW with her children: "Ryan toured them willingly through the halls of George Washington University, giving them their first exposure to higher academics on a beautiful Saturday afternoon." Ex. 4AA at 1. He "has been a very positive role model for my family and I have been ever so grateful for

that peer mentoring that he provided for them, especially as they are finding their own

successes." *Id*.

Frank Stearns, another family friend, similarly describes Mr. Cooper showing his

daughter, Brooke, around GW. He writes that Mr. Cooper "made her feel welcome" and "re-

enforced her enthusiasm to attend GW" and "was genuinely welcoming and honest" with her.

Ex. 4KK at 1. Brooke ultimately attended GW and Mr. Cooper helped her get a job at Sequoia.

Mr. Stearns writes about an anecdote at Sequoia "which is a testament to Ryan's character." *Id*.

Brooke noticed her wallet missing while at work and Mr. Cooper chased the thief down, causing

him to drop his wallet, which Mr. Cooper then retrieved. *Id*. Mr. Stearns writes, "[i]n the grand

scheme of things this is a small deal, but Ryan acted immediately and professionally to do the

right thing." *Id*.

Mr. Cooper's cousin, Jeff McKown, fondly remembers Mr. Cooper taking the time out of

his college graduation—just as he had in high school—to make his family feel truly appreciated.

Mr. Cooper was "being pulled in numerous directions" at his college graduation, but was

"incredibly kind and welcoming, taking the time to make each family member, including me,

feel appreciated and part of the experience with him." Ex. 4Z at 1.

### B.  Coming out as Gay, Mental Health Struggles, and Sexual Assaults

Despite Mr. Cooper's strong support network and achievements in academics, work, and

activities in high school and college, those years were also marked by formative struggles.

Specifically, Mr. Cooper had to contend with coming out as gay in high school, dealing with

severe mental health issues (resulting in his eventual diagnoses of bipolar disorder, panic

disorder, and generalized anxiety disorder), and being sexually assaulted two different times—

once in high school and once in college.

Mr. Cooper started identifying as openly gay in high school. Though it is far more common for gay teenagers today to be open about their sexuality, in the mid-00s, it was rare, especially in a rural environment like Brewster Academy. Dr. Felix writes that he was "the only openly gay student from sophomore to senior years." Ex. 2 at 4. Multiple people in Mr. Cooper's network note how difficult this was for him. Family friend Carole Binder writes, "[i]dentifying as gay at a relatively young age was difficult and I applaud his bravery for coming out," noting that "[n]ot everyone is understanding or supportive[.]" Ex. 4C at 2. His aunt and uncle, Rodney and Denise Spencer, write, "[h]e had a hard time 'coming out' as gay, knowing that he may be judged by us, his family." Ex. 4HH at 1. His family friends Jack and Lisa Burns write, "[l]ife has been tough for Ryan as he came out as a gay man while very young and living away at school. We cannot imagine how this impacted his life and know his classmates were not very accepting." Ex. 4E at 1.

Mr. Cooper also "first became involved in therapy and psychiatric services in high school. Ex. 2 (Dr. Felix report) at 6. In his senior year, he "experienced his first mental break[.]" *Id*. at 4. His mood was "progressively deteriorating, he was becoming more withdrawn, and he stated that he was hopeless for 'no reason.'" *Id*. at 6. One day during a therapy session, he "curled up into a ball and began weeping" and expressed suicidal ideations. *Id*. His therapist tried to find a bed in a hospital, but since one was not immediately available, he was sent home to his family for two weeks. *Id*. at 4, 6.

In college, Mr. Cooper had his second major depressive episode. *Id*. at 6. In his sophomore year, he started working with a new therapist and psychiatrist and was prescribed Effexor. Mr. Cooper "believed that Effexor fostered his depression and he went on a downward spiral." *Id*. at 4. He reported feeling suicidal to GW's student services department and was

ultimately hospitalized for a night before being released to his family.  *Id*. He then started

working with a new therapist and psychiatrist and was diagnosed with major depressive disorder,

bipolar II disorder, and generalized anxiety disorder. *Id*. at 4, 6. He was prescribed a variety of

medication, including lamotrigine (a mood stabilizer used to treat symptoms of bipolar disorder)

and Xanax (a sedative that treats anxiety and panic disorder). *Id*. at 6. His father recalls, "[e]ven

though he sank into some deep depression periods you could still see that he wanted to excel, do

well and be part of the bigger picture." Ex. 4H at 2. Mr. Cooper's current diagnoses are bipolar II

disorder, generalized anxiety disorder, and panic disorder. Ex. 2 at 13. He continues to manage

those disorders through medication and therapy. His current medication regimen includes

Latuda, Lamotrigine, and Valium (as needed). PSR ¶ 69.

      Mr. Cooper's mental health issues are entwined with his history as a victim of repeated

sexual assault. His current therapist, Michael Giordano, writes that his mood disorders "appear to

be at least partly based in traumatic experiences of persistent bullying and sexual assault,

stemming from middle school, high school, and college." Ex. 3C at 1.

      Mr. Cooper was sexually assaulted for the first time in high school, when he was only 15

years old. PSR ¶ 71. His assailant was at least 18 (Mr. Cooper is unsure of his exact age) and one

of the teacher's nephews, who he met at a summit led by the Gay-Straight Alliance. Ex. 2 (Dr.

Felix report) at 3. Mr. Cooper and the individual flirted with each other and they engaged in

some consensual sexual acts. PSR ¶ 71. About a month after the summit, the individual came to

Mr. Cooper's room at the boarding school. *Id*. They undressed and, as the situation intensified,

Mr. Cooper told the individual "no" and that he was not "ready for anal sex." *Id*. Ultimately, the

individual proceeded to anally rape Mr. Cooper, and Mr. Cooper did not fight him off. *Id*.

Mr. Cooper reported the rape to a senior proctor at his dorm. *Id*. The proctor then notified school officials. *Id*. Instead of calling Mr. Cooper's parents, the school officials called their lawyers. *Id*. at ¶ 74. Mr. Cooper "was greatly affected by the school's response to the victimization[,] which was traumatizing." *Id*.

Jonathan Springer, a family friend and attorney, recalls that the Coopers reached out to him for advice at the time. Ex. 4JJ at 1. He remembers, "[i]t was at a time in Ryan's life when he was first truly understanding and dealing with his own sexuality, and facing the difficulty of 'coming out' in a small and conservative school community." *Id*. Mr. Springer opines that the "abuser was aided by poor school policies regarding dorm security, reporting procedures, and confidentiality." *Id*. He notes that "what is more important about this incident" is the response of Ryan and his parents. *Id*. at 2. Rather than seeking money or a lawsuit, "Ryan and his parents were concerned about how the lax policies allowed the assaults to happen and how the school handled reporting and addressing such assaults." *Id*. The school failed to keep the reporting confidential, which resulted in Ryan "suffering" and "bullying and harassing from other students[.]" *Id*. Mr. Springer explains that "[d]espite all that," Ryan's goal was to have the school address issues of safety and reporting of sexual assault, "not revenge or retribution[.]" *Id*. He writes, "I was extremely impressed at that time by Ryan's intelligence, maturity, and understanding." *Id*.

Mr. Cooper was assaulted for a second time in college. Around the summer or fall of 2010, Mr. Cooper fell asleep in his friend's bed. Ex. 2 (Dr. Felix report) at 3. He woke up to his friend raping him. *Id*. Mr. Cooper ultimately decided not to report the incident to the police. *Id*. He later saw his assailant at a local bar. His assailant convinced him "not to say anything" so that their friend group would not reject him. *Id*. This assault, too, greatly impacted Mr. Cooper. In his

PSR interview, he explained that he "continues to relive the 'walk home' after being raped." PSR ¶ 74.

Many of Mr. Cooper's family members and friends are aware of the assaults and their effect on him. His friend Ryan Schweitzer writes, "[h]e had a history of sexual assault at the private school he attended, a trauma I can testify never truly settled." Ex. 4FF at 2. His family friends Jack and Lisa Burns write that it is "an unmistakable tragedy" that Mr. Cooper was twice the victim of sexual assault and "[l]ife has not been easy for him and anyone that has had to deal with sexual assault, coupled with the challenges of being gay in a society that is not always accepting[.]" Ex. 4E at 2.

Mr. Cooper also explained the effects of the assaults at his PSR interview. He described the victimization as "'insidious' in the ways it has affected his life." PSR ¶ 74. He "struggles with self-blame" and feels "unlovable." *Id*. He explained, "[f]rom a trauma aspect, it is invading." *Id*.

### C.  Mr. Cooper's Career

In the summer of 2012, when Mr. Cooper was still in college, he began working as a host at Sequoia, a restaurant in Georgetown that was one of the highest grossing restaurants in the country during his tenure there. *Id*. ¶ 121. After only a month, he was promoted to head host. *Id*. In fall of 2012, Mr. Cooper returned to school, but continued to work part-time at Sequoia. *Id*. In 2013, after graduation, he was offered a full-time managerial position and was later promoted to Assistant General Manager. *Id*.

Faith Victoria-Rubin, Mr. Cooper's former coworker at Sequoia, writes that she met Ryan his first summer at Sequoia, when he was "not even 21 years old" and still in college. Ex. 4EE at 1. At the time, she did not pay much attention to the seasonal "revolving door of 80-100

front of house employees," but she noticed Ryan because of the first impression he made on her. The first time she met him, she "saw a very young-looking, very well groomed, and very properly dressed person who greeted me by name, introduced himself and handed me several clearly legible, grammatically correct and detailed messages that he had taken for me earlier in the day." *Id.* She recalls continuing to be impressed by Mr. Cooper. One time, she had to leave the restaurant to go help out with an emergency at another restaurant and left Mr. Cooper in charge "[w]ithout even a second thought" because she "knew that Ryan ***could*** do it and because I knew he ***would*** do it in a way that would get my result. And he did." *Id.* at 1-2.

Ryan moved quickly up the ranks at Sequoia. He "made it his business to train himself" and three months later, was named Sequoia's scheduling manager, and then within the year was promoted to Assistant General Manager. *Id.* at 2. As scheduling manager, he "very clearly explained and communicated his rules, and he consistently and fairly enforced them," earning him the respect and confidence of a staff who "had a median age twice that of Ryan's and many more years of cumulative restaurant experience than he had been alive." *Id.* Ms. Victoria-Rubin writes that Mr. Cooper was "an exceptionally gifted, precocious and dedicated colleague" and is a "loyal and supportive friend." *Id.* at 3.

Maurizio Reyes, Sequoia's General Manager who hired Mr. Cooper, writes of New Year's Eve in 2014, when Mr. Cooper capably handled two crises. First, Mr. Cooper literally put out a fire from a space heater that burned Mr. Reyes so badly that he had to go to the hospital, leaving Mr. Cooper "in charge of the biggest event of the year." Ex. 4CC at 1. Five hours later, a young woman fell and hit her head on the brick patio. Mr. Cooper secured help, made way for EMS, and helped her into the ambulance. Mr. Reyes writes, "[t]hat's the sort of guy that Ryan is.

No matter what the problem or emergency is, he'll fix it, and then move onto the next one completely unphased." *Id*.

Mr. Reyes explains that he doesn't mean to say that Mr. Cooper is a robot—rather, "[h]e is the most compassionate and passionate manager[] I ever worked with." He writes about Mr. Cooper accompanying a busboy to the hospital after getting injured at work. The busboy did not speak any English, so Mr. Cooper, who is fluent in Spanish, stayed with the busboy for four hours, "translating for him, keeping him company, learning about his family in Mexico who he supported financially from thousands of miles away, and helping him navigate the workers comp/insurance process with the hospital's social worker." *Id*. at 2. Mr. Cooper's family friends, Ivan and Barbara Quinchia, explain that when Mr. Cooper was considering leaving Sequoia, he "shared his concern about the welfare of his employees, many of whom only spoke Spanish. Over the span of four years, he had trained, developed, and in many instances communicated with these employees in their native language," often serving as "the only liaison" for many Spanish-speaking employees. Ex. 4BB at 1.

Mr. Cooper's family members and friends recount the kindness and hospitality he showed them when they visited Sequoia. Carol Adey writes about Mr. Cooper arranging a location on the outdoor deck for her organization to have brunch during a business trip. Ex. 4A at 1. Mr. Cooper changed his plans and arrived earlier than his scheduled shift so that he could meet Ms. Adey and her group. She writes, "[t]he story does not end there. As I was preparing to pay the check, you might imagine my shock when our server told me that the check had been covered by Ryan." *Id*. Cynthia Keliher recalls visiting Sequoia with Mr. Cooper's mother and nine colleagues, including her. Ex. 4U at 1. "Ryan, instead of spending an afternoon with his friends, enjoyed lunch with us, engaged with us in a mature way, and offered his dining and

historic recommendations so we could take advantage of DC while there." *Id*. at 1-2. Kimberly Kingston writes about visiting Sequoia with her mother who would be diagnosed with Alzheimer's shortly after the visit. Mr. Cooper greeted them and took them to a smaller venue for dessert after he got off his shift. Ms. Kingston discreetly told Mr. Cooper about her mother's condition and "he didn't skip a beat. The rapport he had already established with her did not change. He did not suddenly talk louder as some people do with Alzheimer's patients nor did he talk down to her. I was struck by his maturity and compassion." *Id*. at 2. Even years later, when she barely spoke any more, Ms. Kingston's mother continued to remember "Ryan" when asked who the lovely young man was who they met in D.C. *Id*.

In June of 2016, Mr. Cooper resigned from Sequoia. The pace of the restaurant was exhausting and Mr. Cooper wanted to figure out his next steps. He took eight months off from work to reassess his career goals, travel, and spend time with friends and family. Ex. 2 (Dr. Felix report) at 5.

In April of 2017, he obtained a position with Tableau, a software company based in Seattle, Washington. *Id*. He relocated to Seattle, where he worked and lived for ten months. *Id*. His mother writes, "It took extraordinary courage to leave DC, his home, friends, and east coast family to relocate across the country to Seattle where he did not know a single soul." Ex. 4O at 2. He moved back to D.C. to work for Tableau's satellite office in February 2018, and remained there until he resigned prior to his initial appearance in this case. He was promoted twice while there, received "glowing performance reviews," and had strong working relationships with his colleagues. Ex. 2 at 5. He was MVP of his team in 2017. Ex. 4G (Deborah Cooper Blount letter) at 1-2.

Mr. Cooper's work at Tableau was impressive, especially considering that he had no prior experience in either software or sales. Mr. Cooper's cousin, Jeff McKown, writes, "I've followed his career at Tableau—which my firm is a client of—and I've had a number of conversations with him about his work. Ryan has deep technical expertise and strong data analysis and visualization skills." Ex. 4Z at 1. He recalls a time at a family gathering in New Hampshire in which Mr. Cooper "got out his laptop and took me through his work, showing me the various dashboards and capabilities he's built. Not only was I impressed, I found it tremendously helpful and informative for my own work." *Id*. His family friends, Jack and Lisa Burns, write, "[h]aving had the opportunity to read some of his work and communicating with him while at Tableau, we found his intelligence and ability to communicate verbally and in his writing to be exemplary." Ex. 4E at 1. His uncle, Andrew McKown, writes that after Mr. Cooper had a leadership role at one of the top-grossing restaurants in the country, Mr. Cooper taught himself "about data analytics and visualization to lead an impressive and productive tenure in sales at Tableau." Ex. 4Y at 2. His father marveled at his ability to "learn more about the product that Tableau is making and help other co-workers be more effective and productive" in his last year at Tableau, after the warrant had been executed and knowing what he was facing. Ex. 4H at 3. His family friend, Cynthia Keliher, writes that after the execution of the search warrant, Mr. Cooper "without skipping a beat, continued his hard work at Tableau. It takes tremendous work ethic, endurance, and pride to continue to contribute positively to a company, notwithstanding the daily nightmare and anguish of knowing that your future may be temporarily undone due to online behavior." Ex. 4U at 2.

Mr. Cooper resigned from Tableau at the end of January 2020, immediately before his February 4, 2020 initial appearance. Mr. Cooper chose to fill his time between his initial

appearance and sentencing with volunteer work. Mr. Cooper completed a volunteer shift with the

Whitman Walker Clinic. PSR ¶ 122. He also started volunteering at least three times a week with

the D.C. Central Kitchen. *Id*. He completed 31 hours of community service and was originally

scheduled to fill in as Volunteer Program Assistant from March 16 to March 30, 2020. Ex. 4OO

(Letter from Jess Towers at D.C. Central Kitchen) at 1. However, DCCK suspended all of its

volunteer operations on March 15, 2020, due to the COVID-19 outbreak. *Id*. Jess Towers, a

Volunteer Engagement Specialist with D.C. Central Kitchen, writes, "Ryan was a go-getter from

the start. I met him on his second volunteer shift at the kitchen and, after describing his legal

situation to me candidly, … I saw an opportunity to leverage his talents and bubbly personality

to spearhead the volunteer program in my absence[.]" *Id*. She explains that she "was

unexpectedly absent one day, and Ryan immediately stepped up to help even though he had not

yet completed his training. To make matters more challenging, the orientation video that we

normally play for volunteers was not working. Not to be deterred, Ryan recited the entire video

from memory and pumped up 60 volunteers[.]" *Id*. She concludes, "Ryan has always been quick

to raise a hand wherever he can help out" and writes, "I respectfully request that the court take

Ryan's extraordinary volunteer efforts into consideration[.]" *Id*. at 2.

 The pandemic has been challenging for Mr. Cooper and his family. Mr. Cooper's father

writes, "[m]y wife was laid off from her job and we lost half her income," though notes it was a

"blessing in disguise," because it allowed Mr. Cooper's mother to be with him in D.C. Ex. 4H at

4. After two months in isolation, unemployed and without the ability to work, Mr. Cooper filed a

Consent Motion to Modify Conditions of Release to allow him to apply for remote work, which

the Court granted. He applied for 153 jobs before finally being hired by Graphicacy in

September of 2020. Mr. Cooper explains that the company "focuses on serving needful

organizations like the World Bank, the Bill & Melinda Gates Foundation, and the Johns Hopkins University Coronavirus Research Center, I served as the sole sales professional, and developed their entire sales infrastructure from scratch." Ex. 1 (Ryan Cooper letter to the Court) at 1. A few months later, a former colleague recruited Mr. Cooper to join his business intelligence consulting firm. *Id*. Mr. Cooper continues to work there as an Account Executive and as the owner of the relationship between the company and one of its most strategic technology partners, where he used to work. *Id*.

Though he is extremely grateful for the ability to work, it has also been a difficult time for obvious reasons. His father writes, "[w]e continued to be concerned about Ryan's well-being because of the pandemic and all of the bad news that was coming out of the prison system." Ex. 4H at 4. His mother writes, "The pandemic has brought debilitating mental health situations to the healthy, to say nothing of the deleterious [e]ffects to someone with bipolar II disorder." Ex. 4O at 3. She explains, "I have seen up close and personal the ravages of depression as I have held him as he has sobbed and shaked in the late evening and early morning hours beyond." *Id*. She also explains that Mr. Cooper has spent this time, despite the isolation and his depression, focusing on gratitude. She writes, "we also have talked about gratitude.  Gratitude that he was caught, the behavior stopped, more help obtained.  Gratitude of the support from the PSO, Prosecution, and Your Honor for allowing him to look for and secure a job, and for being able to travel home to MA for this past Christmas." *Id*.

### D.  Circumstances Surrounding the Offense

As discussed below, Mr. Cooper does not dispute the seriousness of his conduct, which he deeply regrets. However, there are mitigating circumstances surrounding it. At the time of the offense conduct, Mr. Cooper was in the midst of a deep depressive state, due in part to the side

effects from a poorly matched medication. Mr. Cooper's psychiatrist, Dr. Guzman, explains that a previous prescriber introduced Buspirone into his treatment regimen from October 2017 to December 2018.  Ex. 3A at 1. That medication "resulted in debilitating side effects, including dizziness and symptoms described as depersonalization." *Id*. The start of Mr. Cooper's offending behavior coincided with his time on Buspirone.

Mr. Cooper's deep depressive state—which coincided with a move across the country to Seattle, where he knew no one—also contributed to the offense behavior. Dr. Felix confirms that Mr. Cooper offended "when he was feeling severely depressed and socially isolated" and "he was also not engaging in therapeutic services during this time and he was not prescribed the most appropriate medication for his symptoms[.]" Ex. 2 at 20.

Multiple of Mr. Cooper's family members and friends write about his depressive state while he was in Seattle. His grandmother, Pauline Cooper, writes that he "fell into a deep depression and became suicidal." Ex. 4N at 1-2. His family friend, Kimberly Kingston writes, "in a very short time he conquered 3 life stressors on the top 10 list of life stressors: new home, no job, work pressure. … I believe the change in routine, stress of the new job, long hours and new home were colliding stressors that resulted in an unprecedented trigger for Ryan." Ex. 4V at 2. His aunt, Deborah Cooper Blount, writes, "[b]eing there alone, and isolated, caused Ryan's depression to be accentuated, magnified." Ex. 4G at 2. His friend Andrew Dean writes that he was worried about Mr. Cooper when he said he was moving to Seattle: "I am painfully aware that he struggles with bi-polar disorder (he was hospitalized for suicidal ideations around the time that we met). And I know that his family and friends (myself included) serve as a support network to counter these struggles." Ex. 4Q at 2. His friend Michael Cooper writes, "I did not realize just how depressed [the move] would make him. He was on his own without me or our

other friends and family for pretty much the first time, and a lack of support system there took its toll." Ex. 4M at 2. Michael Cooper explains that even the return to D.C. did not solve Mr. Cooper's depression—"his lingering depression wasn't solved by a return to D.C. I can remember some cries for help that year that I struggled to respond to, like text messages where he more or less begged me to travel less and spend more time with him." *Id*.

Mr. Cooper's own abuse is also mitigating, as confirmed by Mr. Cooper's mental health professionals. Mr. Constant, his sex offense therapist, writes, "[h]e has made significant strides connecting his childhood trauma and the instant offense." Ex. 3B. Mr. Giordano similarly reports, "[h]e has made much progress on his emotional stability, addressing concerns arising out of childhood trauma and depression. He has also made much progress in understanding the motivations and usage of minor oriented-imagery." Ex. 3C at 2.

### E.  History and Characteristics

It is a true testament to Mr. Cooper's character that so many of his family members, family friends, friends, and former colleagues have written to the Court on his behalf. There are a total of 42 letters attached to this sentencing memo.

Those letters, cumulatively, paint the picture of an extremely hard-working, thoughtful, and mature young man, who, despite his own very serious struggles with his mental health and victimization of sexual assault, has managed to genuinely touch the lives of many. The anecdotes and memories offered above from all phases of Mr. Cooper's life show his tremendous strength of character. He deeply values his family and his friends. He shows kindness to those who he does not know as well—like his parents' friends who visited his restaurant and the employees there, especially the Spanish-speaking ones, who needed someone to trust. He works hard, and always has. He studied hard in college, earned promotion after promotion at work, and even took

on additional responsibilities in his short time volunteering at D.C. Central Kitchen. Even as a 15-year-old who had just been sexually assaulted and then extremely mistreated by his boarding school, he sought reconciliation, rather than revenge, and a path forward to make sure that others were treated better in the future. Letter after letter remarks on Mr. Cooper's maturity, thoughtfulness, and kindness—all of which were reflected in how he handled that assault.

The following are some additional anecdotes and statements from Mr. Cooper's family and friends that reflect his character:

- Patrice Sullivan (aunt and godmother): "I can speak to his heart. This is a good, young man with a love for family, friends, and even strangers… . … He needs access to good mental health professionals and his family, as much as we need him." Ex. 4NN.

- Paul DiPietro (parents' neighbor): "Perhaps the most impressive display of his maturity and intellect to me was the heart-warming eulogy he presented for his grandfather last year." Ex. 4R at 1.

- Tyler Rowell (friend): describing how Mr. Cooper helped him through a dark time: "It is his genuine care and willingness to shoulder another's pain which is a true rarity." Ex. 4DD.

- Katherine Wishart (aunt): "In 2017, I fell on black ice sustaining four fractures in my right leg. I now need a cane to walk. Ryan shows me compassion by being by my side assisting me while navigating the stairs. … He is the first one up from the dinner table to assist with after dinner chores." Ex. 4PP.

- Ryan Schweitzer (friend): "When I lost my job with my family, a situation that was as much personal as professional, Ryan did everything in his power to try and guide me to something else. … without his support at that moment, I would have been lost." Ex. 4FF at 2.

- Zach Cooper (nephew of Michael Cooper, Ryan Cooper's close friend): 15-year-old Zach writes about visiting D.C. in the summer of 2019 and getting to know Ryan more: "We were able to talk about everything from Giant Slugs, to politics, to sports, and after dinner when walking to see the White House we talked for the entire walk about disease medicine and history." Ex. 4P at 1. He explains, "[m]aking significant contributions to society and to the lives of other people is an achievement which many people chase throughout their life, and put generations of effort into attaining, an achievement which Ryan Cooper has well surpassed by simply being himself." *Id*.

24

- Mark Cooper (Zach Cooper's father) writes of that same trip, "Ryan treated [my son] like a human being and was genuinely interested in what he learned at camp and wanted to help him anyway he could." Ex. 4L at 1. He also writes, "Ryan has a very kind heart. He made you feel special when you were around him." *Id*.

### F. Deep Remorse

Mr. Cooper is deeply ashamed and sorry for the offense conduct. In his acceptance of responsibility in the PSR, he wrote that he took "full responsibility," that he wrote "to apologize," and that "[t]here isn't a morning where I am not wracked with guilt and dread about what I've done and whom I've hurt. I hate what I've done. … I can't undo the harm that I have perpetrated against the survivors by participating in a system that makes the depictions of their abuse permanently available." PSR ¶ 23. In his letter to the Court, he writes, that "one of my mentors once told me that, 'when you've walked four miles into a deep, dark wood, you have to walk four miles to get back out.'" Ex. 1 (Ryan Cooper letter to the Court) at 2. He continues, "[h]is words seem fitting for my situation. I meandered aimlessly down a path that led me to illegal activity. I got lost and I made detestable decisions. And now, I write to Your Honor today to answer for my loathsome conduct and continue my long hike out of the dark woods." *Id*.

Mr. Cooper's frank conversations with his family and friends, in which he took full responsibility for his actions, are a testament to his remorse. It cannot have been easy to tell over 40 people, from close friends to aunts, uncles, and cousins, to lifelong family friends, about his case, especially given the nature of the offense. But Mr. Cooper not only told people what happened, he often had lengthy and difficult conversations about his case with them.

His friend and former boss at Sequoia, Faith Victoria-Rubin, writes that when Mr. Cooper told her about his case, that her "gut response" was that the consequences were not warranted because she saw the crime as victimless. She expected Mr. Cooper to agree and "was quite surprised when he very calmly but firmly told me that his actions did in fact have victims,

25

that he felt terrible for having participated in predatory behaviors and that he wished he had thought it all through before making an impulsive and poorly conceived decision." Ex. 4EE at 3. Mr. Cooper "then said that the worst consequence of his behavior was that he would have to live with having done it for the rest of his life and that they only way he could make his peace with this knowledge would be to continue to make his own amends even after he paid whatever price would be required of him." *Id*. Mr. Cooper's aunt, Deborah Cooper Blount, describes an extremely similar conversation, in which Mr. Cooper corrected her thinking about his offense. Though she felt the punishment was too harsh, she writes that Mr. Cooper clearly articulated how "those in the pictures that circulate the world wide web over and over are victimized, embarrassed, and shamed" with the sharing of images and his regret that "he had been a cog in that vicious cycle." Ex. 4G.

Mark Cooper, the brother of Michael Cooper (Ryan's close friend) writes, "[b]eing a father of three kids, 21, 14, and 10 I wanted to ask Ryan directly about what he did and why because it is extremely upsetting to me to hear someone that I trust and looked up to could do what he did." Ex. 4L at 1. He and Ryan had an hour-long conversation. *Id*. He writes, "[w]hat I was most impressed with during that conversation is Ryan's attitude and humility. Ryan is genuinely sorry for his mistake and completely understands the ramifications and accepts blame for his actions." He continues, "I didn't hear anything like it was someone else's fault or society's fault." *Id*.

Ryan Schweitzer, a friend, writes that he observed Mr. Cooper "fully breaking down in remorse of the situation" in a conversation with his father. Ex. 4FF at 1. His cousin, Elise Spencer, writes that "Ryan is someone which, despite the cards that he has been dealt, is taking accountability for his actions." Ex. 4II at 2. His cousin Erica writes, "[i]n all of our

communications he has not made excuses for [] himself and has displayed that he is prepared to pay his debt to society and continue living a meaningful life upon his release." Ex. 4LL at 1. His friend, Tyler Rowell, writes "I know Ryan is committed not only to paying his debt to society, but also a debt to himself." Ex. 4DD. His friend, Andrew Dean, writes that he spoke with Ryan almost weekly since the July following the execution of the warrant, "[a]nd every single time he has confessed to being filled with regret and shame." Ex. 4Q at 1.

### G.  Low Likelihood of Re-Offending

Mr. Cooper does not suffer from pedophilia and presents a low risk to recidivate. Dr. Felix, who completed Mr. Cooper's psychosexual evaluation, found, "Mr. Cooper's risk for sexual recidivism is Low and his prognosis is good." Ex. 2 at 20. Mr. Giordano, Mr. Cooper's therapist, concluded that Mr. Cooper "does not fit the diagnostic criteria for Pedophiliac Disorder." He writes, "[b]ased on my professional knowledge, I do not believe that Ryan is at risk of further involvement with such imagery and pornography[.]" Ex. 3C Mr. Constant, Mr. Cooper's sex offense treatment provider, agrees, "his risk for sexual recidivism is deemed low[.]" Ex. 3B.

Dr. Felix further explains that Mr. Cooper has few risk factors to re-offend. He has no prior offenses. Ex. 2 at 16. He has "had several stable relationships" (lack of stable relationships can be a risk factor). *Id*. Though he has mental health diagnoses, he "has good insight into his mental health needs" and "understands the importance of maintaining consistent mental health treatment to avoid deterioration of his symptoms." *Id*. at 18. His history suggests "that he has been proactive in seeking out services when needed throughout his life including after the incident occurred." *Id*. at 19. He "does not meet criteria for an impulsive control disorder, nor does his history suggest problems in the area of impulsivity." *Id*. at 18. He has also been

"compliant with all legal recommendations and has been cooperative and forthcoming with all professionals involved in his case." *Id*. at 19.

Mr. Cooper's acceptance of responsibility and remorse are protective factors that will keep him from re-offending. Mr. Giordano writes, "Ryan has expressed remorse for—and ownership of—the behaviors and has developed an understanding of how the consequences of his actions contribute to the psychological harm of victims and survivors." Ex. 3C. Mr. Constant explains that Mr. Cooper's "rehabilitation progress is considered significantly positive based upon his high empathy level, his deep remorse, his increased insight into his past behaviors." Ex. 3B. Dr. Felix concurs, writing, "Mr. Cooper is highly empathetic and expresses deep remorse, which are factors that indicate a positive prognosis." Ex. 2 at 20.

Mr. Cooper has a wealth of other protective factors that will prevent re-offense. Dr. Felix explains that those include "consistent involvement with mental health professionals, stable employment, a strong support system, and… no rejection to engaging in remediation." *Id*. at 20-21.

Mr. Cooper's treatment providers also confirm that there is absolutely no evidence that Mr. Cooper has or ever would attempt to engage in a contact offense. Mr. Cooper made no attempt to contact any minors (or law enforcement posing as minors), as many people charged with distribution of child pornography have done. The internet, including Tumblr, is unfortunately rife with opportunities for people to discuss real-world activity and attempt to engage in it—but there is zero evidence that Mr. Cooper ever even tried.

Mr. Constant, the psychotherapist who has been treating Mr. Cooper for sexual offense rehabilitation, confirms, "[p]lease note, Mr. Cooper has consistently denied any contact offense(s) and there are no indications that would suggest otherwise." Ex. 3B. Dr. Felix confirms

the same, "[i]n looking at the sexual risk assessments outlined [in my report] and Mr. Cooper's

overall risk for recidivism, he did not display any distortions that would suggest he has a

tendency for a hands-on offense or attraction to minors." Ex. 2 at 20.

### III.   THE REQUESTED SENTENCE OF 60 MONTHS' IMPRISONMENT IS APPROPRIATE BASED ON THE FACTORS SET FORTH IN 18 U.S.C. § 3553(a).

The overarching goal of any sentencing is to "impose a sentence sufficient, but not

greater than necessary" to accomplish the purposes of sentencing. 18 U.S.C. § 3553(a).  Section

3553(a) instructs courts to consider the following factors when determining a sentence: (1) the

nature and circumstances of the offense and the history and character of the defendant; (2) the

purposes of sentencing; (3) the kinds of sentences available; (4) the applicable advisory

sentencing guideline range; (5) the need to avoid unwarranted sentence disparities among

defendants with similar records who have been found guilty of similar conduct, and (6) the need

to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

Those factors weigh in favor of a sentence that allows Mr. Cooper to continue in his

young career, re-unite with his many close family members and friends, and continue to

participate in mental health treatment, under conditions tailored to mitigate further the already

low risk that he will re-offend.

### A.  The Nature and Circumstances of the Offense and the History and Character of the Defendant Are Served By a 5-Year Sentence.

Mr. Cooper fully recognizes that the nature and circumstances of the offense are horrible.

He writes, "I committed a very serious and damaging crime and knowing that hangs on my heart.

And it always will." Ex. 1 (Ryan Cooper letter to Court) at 1. He explains, "I perpetuated harm

against those survivors and added to their suffering. One would think that I'd have known better

as a two-time survivor of sexual assault myself. I cannot express how much I wish I had." *Id.*

29

A sentence of five years accounts for the nature of the offense but also reflects Mr. Cooper's character and everything he has awaiting him in the community.

Mr. Cooper's history and character suggest that five years of incarceration is enough. Mr. Cooper, at 29, has lived a life of achievement and kindness towards others, despite the very serious obstacles of his mental health struggles and the sexual assaults he suffered. After being raped twice, first at age 15, and again when in college, he has gone on to a successful career, first in food service, and then in data analytics. He has managed this despite his struggles with bipolar II disorder, generalized anxiety disorder, and panic disorder. He has no prior encounters with the legal system, except as a victim. Even then, at age 15, he chose, rather than seeking prosecution and retribution, to push for reforms at his high school to make sure that the horror that befell him was not repeated. He is, by all accounts, a thoughtful young man who frequently goes out of his way to make his family, friends, colleagues, and strangers feel special and appreciated.

This offense is so utterly inconsistent with his character that his loved ones express total shock at it. *See*, *e.g.*, Ex. 4Q (Letter from friend Andrew Dean) ("I was, and remain, shocked at his behavior. It took me some time to come to terms with the situation given its nature and how out of character it seemed."); Ex. 4W (Letter from family friend Lori Lerner) ("That does not sound like anything I would have ever expected of him."); Ex. 4C (Letter from family friend Carol Binder) ("Knowing Ryan as well as I do, I am having a difficult time reconciling him with the situation he is in currently. It does not fit at all with his moral character and values."); Ex. 4BB (Letter from family friends Ivan and Barbara Quinchia) ("Frankly we were very shocked upon hearing about the incident, because the Ryan we have known and grown to love is a person always concerned about the underdog, the disenfranchised and individuals lacking representation and advocacy.").

Mr. Cooper, too, believes that this offense was completely out of character for him. He concludes his letter, "What I wish more than anything, your Honor, is for the world to see that my illegal conduct is not a reflection of my true character, so much as a cautionary tale about the dangers of social isolation and lack of mental health seeking behaviors." Ex. 1. He pledges, "[t]his will not happen again, ever." *Id*.

### B. The Purposes of Sentencing are Served by Mr. Cooper's Proposed Sentence.

Section 3553(a)(2), Title 18, identifies four purposes of sentencing: to (1) "reflect the seriousness of the offense… and to provide just punishment for the offense"; (2) "afford adequate deterrence to criminal conduct"; (3) "protect the public from further crimes of the defendant"; and (4) "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." A five-year term of imprisonment is the sentence that optimally accomplishes those objectives.

*1.   The proposed sentence reflects the seriousness of the offense.*

Five years is a substantial period of incarceration. This is especially true for a 29-year-old young man at a critical point in his professional life, who will miss out on the most formative years of his career. And it is particularly true for someone who suffers from serious mental health issues that are exacerbated when he is isolated from his family and friends. Mr. Cooper is also a slight, homosexual young man who will have been convicted of a sex offense and was the victim of sexual abuse in the past. All of those factors make Mr. Cooper more susceptible to abuse in prison, which will make his period of incarceration that much more challenging. *See United States v. D.W*., 198 F. Supp. 3d 18, 66–67, 71 (E.D.N.Y. 2016) (noting that, as acknowledged by the Bureau of Prisons, "several factors render an inmate especially susceptible to abuse while in prison. They include being perceived as gay, having been a victim of sexual

abuse in the past, suffering from mental illness, and being a known sex offender, particularly against children" and that incarcerated individuals "with a history of mental health problems reported higher rates of sexual victimization than other inmates."); *see also United States v. Lara*, 905 F.2d 599, 605 (2d Cir. 1990) (affirming downward departure from guidelines sentence for young-looking bisexual individual and finding that "[e]xtreme vulnerability of criminal defendants is a proper ground for departure from a guidelines sentence.").

It should also be noted that Mr. Cooper "re-blogged" material on Tumblr, which is similar to "re-tweeting" and different from posting original content. Further, Mr. Cooper did not try to avoid detection by using routers or anonymizers or encryption or a public IP address. Rather, he used his own home address and his own Tumblr account that was linked to his own phone number. Nor did he try to use software to wipe hard drives to prevent law enforcement from recovering previously deleted files. Instead, once the search warrant was executed, he did everything in his power to assist law enforcement. For all of these reasons, the five-year mandatory minimum adequately affects the seriousness of the offense.

*2. The proposed sentence affords adequate general deterrence.*  For those same reasons, a five-year term of incarceration affords adequate general deterrence. By their nature, mandatory minimum sentences send a strong deterrent signal. A five-year term of imprisonment is substantial. It serves adequately to deter this type of conduct.

*3. The proposed sentence is more than necessary to foster specific deterrence.*  For reasons already explained, there is very little need here for the sentence to foster specific deterrence. Mr. Cooper stopped the offending conduct once the search warrant was executed— and has been in the community, offense-free, for over *two years* since. He was in the community for nearly a year between the dates of the execution of the warrant and his initial appearance, and

did not re-offend or flee, despite knowing the consequences he faced. He has now been on pretrial release and supervision for over a year. His performance has been spotless.

His actions since the execution of the search warrant show how seriously he has taken this. He immediately told his therapist, Michael Giordano, about the offense. Ex. 3C at 1. He sought out Jean-André Constant, a sex offender treatment provider, for additional treatment related to the offense. To date, Mr. Cooper has attended over 147 combined sessions with Mr. Giordano and Mr. Constant addressing the offense conduct.

As Dr. Felix, Mr. Giordano, and Mr. Constant all confirm, Mr. Cooper's risk for recidivism is exceedingly low. *See* Section 2.G., *supra*.

The conclusions of Dr. Felix, Mr. Giordano, and Mr. Constant are backed by extensive recent research about the low rates of recidivism among sexual offenders in general. The United States Sentencing Commission's research demonstrates that a history of stable employment, a college education, lack of criminal history, and family ties and responsibilities all predict reduced recidivism across offenses, *see Measuring Recidivism*, United States Sentencing Commission (May 2004)  at 12-13.[1]

"[T]he research consistently demonstrates that recidivism rates for people who have been convicted of a sex offense are substantially lower than most people believe, and in fact, are among the lowest of all people convicted of a crime." Mary Helen McNeal & Patricia Warth, *Barred Forever: Seniors, Housing and Sex Offense Registration*, 22 KAN. J.L. & PUB. POL. 317, 344-45 (Spring 2013), at 344-345.

---

[1] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf

Those rates are even lower for individuals like Mr. Cooper, who have no record of contact behavior and no prior offenses. *See* Written Statement of Michael C. Seto, Ph.D., C. Psych. before the U.S. Sentencing Commission at 3 (Feb. 15, 2012),[2] (citing research that shows that online (mostly child pornography) offenders had recidivism rates that were "relatively low compared to the average recidivism rates found for contact offenders" and "[i]n particular, **first-time child pornography possession only offenders appear to be very low risk of sexual recidivism**, in contrast to those with any prior or concurrent criminal convictions or those who engage in other sexual offending (e.g., attempted or actual contacts with a child, production of child pornography).") (emphasis added); *see also* Written Statement of Richard Wollert, Ph.D. before the U.S. Sentencing Commission, at 20 (Feb. 15, 2012) (drawing on his decade of supervising child pornography offenders and concluding that the typical child pornography offender "**is mortified by his criminal internet behavior once he is confronted with its reality in the wake of being arrested. This reaction is helpful for motivating him against relapse, which is rarely encountered**.") (emphasis added). [3] Dr. Wollert explicitly recommends increasing "efforts to support the reintegration of CPOs into the community sooner rather than later. **The more an ex-CPO is tied to the community, and the greater his stake in it, the less likely he will be to reoffend**." *Id*. at 22 (Emphasis added).

There is thus every reason to believe that Mr. Cooper will not reoffend. A five-year sentence is far more than necessary to foster specific deterrence.

---

[2] Available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20120215/Testimony_15_Seto.pdf

[3] Available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20120215-16/Testimony_15_Wollert_2.pdf

### C.  The Guidelines Range Fails to Identify the "Sufficient But Not Greater Than Necessary" Sentence.

The guidelines range applicable to Mr. Cooper is 151 to 188 months. *See* PSR ¶ 135. Of course, as this Court is well aware, the Guidelines are merely "one factor among several courts must consider in determining an appropriate sentence." *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). *See also United States v. Pickett*, 475 F.3d 1347, 1353 (D.C. Cir. 2007) ("Another approach, the correct one in our view, is to evaluate how well the applicable Guideline effectuates the purposes of sentencing enumerated in § 3553(a)."). Indeed, despite this guidelines range, U.S. Probation has recommended a custodial sentence of sixty months in this case. ECF No. 18.

Here, Mr. Cooper's guidelines range is driven by a number of enhancements that the United States Sentencing Commission has criticized. In its 2013 report, the Sentencing Commission found that the current sentencing scheme in U.S.S.G. § 2G2.2 does not accurately measure the severity of non-production child pornography offenses. U.S. SENT'G COMM'N, FEDERAL CHILD PORNOGRAPHY OFFENSES at 207, 321 (Feb. 2013).[4] According to the Commission, this is due in part of the fact that "the sentencing scheme … has not been updated for nearly a decade" and fails to "account for significant changes in offense conduct, particularly in technology, that have occurred in recent years." *Id*. at 207. Conduct that is now typical of almost every child pornography offense "triggers multiple guideline enhancements and exposes the vast majority of defendants today to substantial penalty ranges." *Id*.

---

[4]Available at: https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf

More specifically, the Commission found that before advances in computers, the internet, and digital cameras, "child pornography was difficult to find, risky to produce, expensive to duplicate, and required a secure and private storage area," as offenders typically received and distributed it in printed form using the U.S. mail. *Id*. at 42, 312. Now, most offenders rely on internet or internet-enabled technology to access and distribute child pornography. *Id*. at 42. These changes in technology have made it significantly easier to access and distribute child pornography. "All of these technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography, including many graphic sexual images involving very young victims, a genre of child pornography that previously was not widely circulated." *Id*. at 6. An "entry-level offender," like Mr. Cooper, can now easily access and distribute large amounts of child pornography at no financial cost and often in an anonymous, indiscriminate manner. *Id*. at 312.

Yet, as the Sentencing Commission stated in its 2013 report, "the sentencing scheme for non-production offenses has not been updated for nearly a decade. It thus does not account for significant changes in offense conduct, particularly in technology, that have occurred in recent years — such as the widespread use of peer-to-peer ("P2P") file sharing, which typical offenders now use to receive and distribute large quantities of graphically violent child pornography." *Id*. at 207. The sentencing scheme has not been updated since the 2013 report. Thus, a relatively less serious offender can now be saddled with a disproportionate guidelines range.

All four of the enhancements that apply to this case—nature and volume of the images possessed, an offender's use of a computer, and distribution of images—are ones that the Commission identified as "originally … promulgated in an earlier technological era" when child pornography was typically received and distributed in printed form. *Id*. at 313 (citing U.S.S.G. §

2G2.2(b)(2)-(4), (6)-(7)). Now, these enhancements are "being applied routinely to most offenders." FEDERAL CHILD PORNOGRAPHY OFFENSES at 313. For example, in 2010, the "typical non-production offender" was subject to three of the four the enhancements present here— images of pre-pubescent minors, use of a computer, and quantity of images—in more than 96 percent of cases. *Id*. at 316. *See also United States v. Dorvee*, 616 F.3d 174, 186–87 (2d Cir. 2010) ("An ordinary first-time offender is therefore likely to qualify for a sentence of at least 168 to 210 months, rapidly approaching the statutory maximum, based solely on sentencing enhancements that are all but inherent to the crime of conviction. Consequently, adherence to the Guidelines results in virtually no distinction between the sentences for defendants like Dorvee, and the sentences for the most dangerous offenders who, for example, distribute child pornography for pecuniary gain and who fall in higher criminal history categories. This result is fundamentally incompatible with § 3553(a).").

### D.  The Need to Avoid Unwarranted Sentencing Disparities Counsels in Favor of a Five-Year Term of Imprisonment.

Other cases in this district involving similar, if not worse, conduct than alleged here regularly result in below-guidelines sentences. Indeed, the 2013 Sentencing Commission report found, "[s]ince *Booker*, sentencing courts have increasingly exercised their discretion to impose below range sentences for non-production child pornography offenses." *Id*. at 124. The following cases are instances of either distribution cases where the court imposed the mandatory minimum, or cases in which the charge was possession (even though the facts supported distribution) and the sentence was below the guidelines:

1.  In  *United States v. Blanchard*, 1:18-cr-00376 (JEB) (D.D.C. Jan. 27, 2020), Judge Boasberg imposed a sentence of 60 months incarceration, followed by 60 months of supervised released for distribution of child pornography. Mr. Blanchard responded to a posting

by an undercover agent and sent the agent a link with dozens of files of child erotica, as well as multiple videos showing digital penetration and oral sex performed on a prepubescent child by an adult. Mr. Blanchard also added the agent to a KIK group for trading child pornography. Mr. Blanchard also had a prior conviction for cyberstalking. The guidelines were 78 to 97 months and the government requested a sentence of 97 months.

2.   In *United States v. Aron Patterson*, 1:19-cr-00355 (DAR) (D.D.C. Jan. 27, 2020), Judge Friedman imposed a sentence of 60 months incarceration, followed by 60 months of supervised released for distribution of child pornography. The defendant was in a KIK chat group of about nine other users posting child pornography. An undercover officer entered the group and the defendant subsequently posted multiple child pornography files.

3.   In *United States v. Christopher Solorzano*, 1:19-cr-00282 (TJK) (D.D.C. Dec. 3, 2019), Judge Kelly sentenced the defendant to 60 months' imprisonment, followed by 60 months of supervised release. Mr. Solorzano responded to a posting by a government agent on a website believed to be used by individuals with a sexual interest in children and proceeded to send the agent several images of child pornography, as well as nude and partially clothed pictures of his minor stepdaughter with whom he claimed to have engaged in sexual activity. Mr. Solorzano also discussed traveling to Washington, D.C. to engage in sex acts with the agent's purported 8-year-old child.

4.   In *United States v. Pasha Pakdel*, 1:17-cr-00165 (RJL) (D.D.C. June 11, 2019), Judge Leon imposed a sentence of one day imprisonment, credit for time served, to be followed by 120 months of supervised release. Though the charge was possession of child pornography, over a two-year period, the defendant made multiple child pornography files available for download on a peer-to-peer network—and many of those files were downloaded by other users.

The defendant had approximately 215 videos and 212 images of child pornography on his computer, including videos and images depicting prepubescent children being vaginally penetrated by adult penises.

     5.   In *United States v. Brian Schwan*, 1:17-cr-00175 (CRC) (D.D.C. Jan. 29, 2018), Judge Cooper imposed a sentence of 60 months imprisonment, to be followed by 120 months of supervised release, for distribution of child pornography. The defendant in that case sent 36 videos, which included videos with children as young as infants being sexually assaulted by men and women, including penetration, to an undercover agent, and chatted with the agent about arranging sex with the agent's purported 9-year-old daughter. Mr. Schwan's guidelines range was 151 to 188 months.

     6.   In *United States v. Cole Christian*, 1:18-cr-104 (RC) (D.D.C. Aug. 9, 2018), Judge Contreras imposed a sentence of 37 months in prison, to be followed by 10 years of supervised release. Though the defendant was charged with possession, the facts supported distribution. The defendant sent multiple images of prepubescent children engaged in sex acts to an undercover officer over a course of months, and engaged in an ongoing chat with the undercover officer in which the defendant said that he had two previous sexual relationships with 13-year-olds and discussed engaging in 3-way sex acts with the undercover's purported 9-year-old daughter.

     7.   In *United States v. Thomas Meekins, Jr.*, 1:17-cr-103 (ABJ) (D.D.C. May 14, 2018), Judge Berman Jackson imposed a term of 24 months incarceration, to be followed by 48 months supervised release. Though Mr. Meekins was charged with possession of child pornography, he had been using Ares, a peer-to-peer file-sharing network. The guidelines range in that case was 78-97 months.

8.   In *United States v. Michael Jacob*, 1:17-cr-0023 (JEB) (D.D.C. Sept. 19, 2017), Judge Boasberg imposed a sentence of 60 months' imprisonment, to be followed by 120 months of supervised release, for distribution of child pornography and travel with intent to engage in illicit sexual conduct. In that case, the defendant arranged to meet an undercover agent and his purported 9-year-old daughter for purposes of the defendant having sex with the agent's daughter. The defendant proposed that he and the agent both urinate on the agent's purported daughter. The defendant also sent images of child pornography to the agent before the meeting and brought a cell phone and laptop with over 600 images of child pornography to the meeting for the agent to download. The guidelines range was 108 to135 months.

9.   In *United States v. Brian Hess*, 1:17-cr-00002 (KBJ) (D.D.C. Sept. 7, 2017), this Court imposed a sentence of 60 months' imprisonment, to be followed by 120 months of supervised release, for distribution of child pornography. Over 600 images, including images depicting sadomasochistic acts involving children and sex acts being performed on prepubescent children were found on the defendant's computer. The guidelines range in that case was 151 to 188 months.

10. In *United States v. Jason Gordon*, 1:17-cr-00026 (TFH) (D.D.C. May 9, 2017), Judge Hogan imposed a sentence of 60 months' imprisonment, to be followed by 10 years of supervised release, for distribution of child pornography. In that case, the defendant arranged to meet an undercover agent and his purported 9-year-old daughter for purposes of the defendant having sex with the agent's daughter. The defendant also sent multiple videos to the agent depicting prepubescent girls engaged in sex acts with adult men. The defendant had 300 to 400 images of child pornography on his phone. The guidelines range in that case was 135 to 168 months.

11. In *United States v. Bayo Bakare*, 1:16-cr-00129 (TSC) (D.D.C. Nov. 9, 2016), Judge Chutkan imposed a sentence of 60 months' imprisonment, to be followed by 120 months of supervised release, for distribution of child pornography. In that case, the defendant arranged to meet an undercover agent and his purported daughter for purposes of the defendant having sex with the agent's daughter. The defendant also sent multiple videos depicting prepubescent and teenage girls being sexually abused to the agent. The guidelines range in that case was 151 to 188 months.

12. In *United States v. Ryan Young*, 1:16-cr-00082 (CRC) (D.D.C. Aug. 17, 2016), Judge Cooper imposed a sentence of one year and one day imprisonment, to be followed by 60 months of supervised release. Though the defendant was charged with possession, the defendant sent multiple images of child pornography to an undercover agent, solicited images of the agent's purported 9-year-old daughter, and discussed engaging in sex acts with the purported daughter. The guidelines range in that case was 108 to 135 months.

13. In *United States v. Mark Misiano*, 1:16-cr-00048 (RDM) (D.D.C. July 26, 2016), Judge Moss imposed a sentence of nine months' imprisonment, to be followed by 120 months of supervised release. Though the defendant was charged with possession, the defendant distributed multiple pornographic images of prepubescent children to an undercover agent. The guidelines range in that case was 70-97 months.

14. In *United States v. Wesley Hawkins*, 13-cr-244 (KBJ) (D.D.C. Nov. 21, 2013), this Court sentenced Mr. Hawkins to three months incarceration to be followed by 73 months of supervised release. The defendant was charged with possession, but had uploaded five videos depicting child pornography to You Tube and sent multiple child pornography videos to an

undercover agent both through email and through a shared Skydrive account. The guidelines range in that case was 97 to 121 months.

15. In *United States v. Kevin Boteler*, 1:12-cr-00224 (EGS) (D.D.C. May 20, 2013), a case with a guideline range of 70-87 months, Judge Sullivan sentenced the defendant to 24 months of incarceration followed by six months spent in a residential treatment program for recovering sex offenders. The defendant in that case sent an undercover agent a video showing a very young child (about three or four years old) engaged in a sex act. The government sought a sentence of 70 months' incarceration in that case.

16. In *United States v. Douglas Payne*, 1:11-cr-317 (ABJ) (D.D.C. July 28, 2011), a case involving both the possession of child pornography and traveling for the purpose of engaging in sex with a child, Judge Berman Jackson imposed a sentence of 60 months' imprisonment on both counts (to run concurrently), to be followed by ten years of supervised release.  The sentencing guidelines in Mr. Payne's case were 78-97 months imprisonment.

17. In *United States v. John Moreira*, 10-cr-002 (ESH) (D.D.C. May 5, 2010), a possession case with a guidelines range of 78 to 97 months, the defendant was sentenced to 60 months' probation with 60 days to be served on weekends. In that case, the defendant used peer-to-peer software to share files with an undercover law enforcement agent. When the defendant was arrested, law enforcement found over 800 images and 5 videos of child pornography, including images of prepubescent children, in the defendant's possession. Notably, the Court successfully terminated Mr. Moreira's probation after three years based on flawless compliance with its terms.

18. In *United States v. Michael Rowan*, 09-cr-225 (RMU) (D.D.C. Jan. 5, 2010), a possession case with a Guidelines range of 97 to 120 months, Judge Urbina sentenced the

Defendant to 24 months' imprisonment with 180 months of supervised release. Though the defendant was charged with possession, the Statement of Facts accompanying his plea agreement indicates that the defendant distributed 16 images to an undercover officer through peer-to-peer computer software. Upon investigation, 826 images of child pornography were found in the defendant's possession, including images of infants and toddlers.

## CONCLUSION

Mr. Cooper took responsibility for his crime and is committed to not re-offending. The mitigating circumstances, namely his serious mental health issues and sexual victimization, are compelling. He is at a low risk to re-offend. He has an extremely strong community, as evidenced by the 42 attached letters of support, awaiting him at the end of his sentence. Mr. Cooper respectfully submits that a five-year sentence and five years of supervised release is the appropriate sentence here. He respectfully requests that he be permitted to self-surrender to the Bureau of Prisons, in light of the ongoing COVID-19 pandemic and the imminence of widespread vaccine availability.[5]

Dated:  February 25, 2021

Respectfully submitted,

By */s/ Emily Voshell*

Emily Voshell (D.D.C. Bar No. 1029403)
Jonathan Jeffress (D.D.C. Bar No. 479074)
**KaiserDillon PLLC**
1099 14th St. NW, 8th Floor West
Washington, D.C. 20005
Phone: (202) 683-6150
Fax: (202) 280-1034
evoshell@kaiserdillon.com
jjeffress@kaiserdillon.com

*Attorneys for Defendant Ryan Cooper*

---

[5] If the Court requires additional briefing regarding self-surrender, Mr. Cooper respectfully requests the opportunity to submit a supplemental pleading regarding self-surrender.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 25th day of February 2021, I filed the foregoing with the Clerk of the United States District Court for the District of Columbia by using the CM/ECF system, which system I understand has provided electronic notice counsel of record.

Dated:  February 25, 2021                           */s/ Emily Voshell*
                                                    Emily Voshell